```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------- X
DRESS FOR SUCCESS WORLDWIDE,       :
                                   :
                 Plaintiff,        :
                                   :
        -against-                  :       OPINION & ORDER
                                   :       08 Civ. 6744 (JFK)
DRESS 4 SUCCESS,                   :
                                   :
                 Defendant.        :
-------------------------------- X
```

**APPEARANCES**

    **For Plaintiff Dress for Success Worldwide**

        Shearman & Sterling LLP
        599 Lexington Avenue
        New York, New York 10022
          Of Counsel:  Jaculin Aaron, Esq.
                        Susan Reiss, Esq.
                        John C. Scalzo, Esq.

    **For Defendant Dress 4 Success**

        Paul Hastings Janofsky & Walker LLP
        Park Avenue Tower
        75 East 55th Street, First Floor
        New York, New York 10022
          Of Counsel:  Robert Sherman, Esq.
                        Natalie Furman, Esq.

**JOHN F. KEENAN, United States District Judge:**

    Plaintiff Dress for Success Worldwide ("Worldwide") moves for a preliminary injunction against Defendant Dress 4 Success ("D4S"). Worldwide alleges trademark infringement and asks the Court to enjoin D4S from using the DRESS 4 SUCCESS mark and the www.dress4success.org

website.   D4S cross-moves for a preliminary injunction, alleging trademark infringement and unfair competition. D4S seeks to enjoin Worldwide from using the DRESS FOR SUCCESS mark in the Los Angeles area.

For the reasons discussed below, the Court grants Worldwide's motion and denies D4S's motion.

## I.  BACKGROUND

Unless noted otherwise, the following facts are undisputed.

### A.  The Parties

Plaintiff Worldwide is a nonprofit organization that provides disadvantaged women with business attire and career support services. It is international in scope, with seventy affiliates in the United States and seventeen in Canada, Europe, and New Zealand. Since at least September 1996, Worldwide has owned and continuously used the trade name and service mark DRESS FOR SUCCESS. On January 26, 1999, Worldwide registered this trade name with the U.S. Patent and Trademark Office.

Like Worldwide, Defendant D4S is a nonprofit organization that provides professional attire and career services to disadvantaged women and (unlike Worldwide) men. Founded by Janet Lavender ("Lavender") in 1996, D4S is organized under California law and operates exclusively in

the Los Angeles area.  It has used the trade name and service mark DRESS 4 SUCCESS since the fall of 1996.

**B.  Early Interactions and Affiliation**

In or around late 1998 or early 1999, Worldwide began using the DRESS FOR SUCCESS mark in the Los Angeles area through an affiliate.  Shortly thereafter, D4S contacted Worldwide and demanded that it cease using this mark in and around Los Angeles, claiming that Worldwide was infringing D4S's common law trademark rights.  According to D4S, Worldwide and its affiliate complied with this demand.

On January 18, 2001, D4S entered a membership agreement and a trademark licensing agreement (the "Agreements") with Worldwide and began operating as DRESS FOR SUCCESS LOS ANGELES, a Worldwide affiliate (the Court refers to this period as "Affiliation").  Under the Agreements, Worldwide granted D4S a license to use the DRESS FOR SUCCESS mark for seven years.  D4S claims that Worldwide induced D4S to enter the Agreements by promising to share donations and proposing a joint fundraising event.

After affiliating with Worldwide, D4S amended its articles of incorporation, officially changing its name to DRESS FOR SUCCESS LOS ANGELES. (Gordon Decl. Ex. 8.) Subsequent to this change, in several news stories and interviews, the organization referred to itself as its new

mark, DRESS FOR SUCCESS LOS ANGELES.  D4S contends that it
still used its DRESS 4 SUCCESS mark for certain matters
during Affiliation.  Specifically, D4S claims that it used
the mark on the signs outside of its places of business and
on its company checks.  D4S avers that Worldwide and its
officers were aware of the mark's continued use and further
avers that the Agreements permitted such use. (Lavender
Decl. ¶¶ 22-27.)  Worldwide explicitly acknowledged D4S's
use of the DRESS 4 SUCCESS mark in a memo, dated March 1,
2006, from Joi Gordon ("Gordon"), Worldwide's chief
executive officer, to Lavender, in which Gordon instructed
D4S to "separat[e] out contributions to the men's
organization, Dress 4 Success." (Id. Ex. H.)

Worldwide disputes that it was aware of D4S's
continued use of the DRESS 4 SUCCESS mark.  It also
questions whether the mark was in fact used during
Affiliation.  Gordon stated that, on her visits to D4S's
places of business during Affiliation, she only came across
a DRESS 4 SUCCESS sign once, and Lavender assured her that
it would be replaced with a DRESS FOR SUCCESS sign. (Gordon
Reply Decl. ¶¶ 4-8, 10-13.)

### C.  Termination of Affiliation

In a letter dated February 19, 2008, Worldwide
notified D4S that it intended to recommend to its board

that D4S's membership be terminated.  D4S did not contest the termination, which was effected at a board meeting on March 6, 2008.  According to Worldwide, D4S's membership was terminated for "poor performance, failure to adhere to proper standards for a non-profit organization, actions that harmed the reputation of Dress for Success, and other inappropriate behavior." (Mem. of Law in Support of Pl.'s Motion for Prelim. Inj. ("Pl.'s Mem.") 7.)  Specifically, Worldwide alleges the following:

- "Defendant frequently failed to be available or responsive to actual and prospective donors, sponsors, and volunteers, many of whom complained to [Worldwide] about Defendant." (<u>Id.</u>)

- "Defendant cashed a $10,000.00 check from a corporate sponsor of [Worldwide] that was payable to and intended for [Worldwide] and did not honor repeated requests by the corporate sponsor for repayment." (<u>Id.</u>)

- "Defendant recognized donations (including one donation of 25,429 pairs of shoes valued at $890,015.00) with improper tax receipts and failed to respond to donor requests for tax receipts." (<u>Id.</u>)

- "Defendant received the lowest rating on five of the six categories reported on [Worldwide's] 2007 annual

survey.   In a single year, from 2005 to 2006, Defendant's total 'suitings' declined from 2,700 to 550; second suitings declined from 800 to zero; active volunteers declined from 78 to 20; total funds raised declined from $75,602.00 to $47,180.00; and [Professional Women's Group] members declined from 75 to 40." (<u>Id.</u>)

- "Defendant experienced sharp declines in the funds it raised and the number of clients served, with fundraising falling from $80,000.00 in 2002 to $47,180 in 2006, and the number of clients served falling from 3,500 in 2002 to 550 in 2006.   By contrast, a [Worldwide] affiliate in the smaller market of Houston, Texas raised $921,951.06 and served over 2,251 clients in 2006." (<u>Id.</u>)

- "Defendant's profit and loss statement for the first two quarters of 2007 showed that Ms. Lavender spent $4,748.18 (approximated %18 of Defendant's revenue for that period) on an automobile lease, and that Defendant's net operating income for that period was only $1,029.01." (<u>Id.</u> at 7-8.)

- "Defendant failed to submit required information on time or at all." (<u>Id.</u> at 8.)

- "Defendant elected not to participate in events that would have enhanced Defendant's relationship with national sponsors of [Worldwide] and harmed [Worldwide's] reputation with sponsors by Ms. Lavender's inappropriate behavior." (Id.)

D4S characterizes the termination of its membership as the culmination of a campaign of inequitable conduct by Worldwide. D4S alleges that Worldwide began acting in bad faith when, shortly after Affiliation, Worldwide failed to hold the promised joint fundraising event and refused to share proceeds raised from Los Angeles-area donors. D4S also chafed under the "intrusive requirements" of Worldwide's communications, policy, and accountability guidelines (the "Guidelines"). (Def.'s Mem. of Law in Opp'n to Pl.'s Motion for a Prelim. Inj. ("Def.'s Response") 4.) D4S argues that the Guidelines so closely regulated operations that they threatened to make D4S a part of an "unauthorized and illegal franchise system." (Id.) D4S further alleges that, after it sought temporary financial assistance from Worldwide in late 2005 and early 2006, Worldwide placed it on probation. D4S complains that the probation's terms heavily restricted its operations, all but guaranteeing its poor performance in 2006.

According to D4S, this campaign of inequitable conduct continued in 2007, when Worldwide suggested that it had found a potential donor – a "fairy godmother," in Defendant's words – that could provide substantial support to D4S.  D4S alleges that Worldwide made this claim in order to discourage D4S from seeking a different organization with which to affiliate.  Purportedly, Worldwide only later revealed that, in order to receive the "fairy godmother's" support, D4S would have to restructure and then marginalize Lavender.  When D4S refused, Worldwide allegedly announced its intention to open an affiliate in Hollywood, California, only to recant later.

D4S claims Worldwide then "set out to create a 'record' that it could use as a basis for terminating" D4S's membership. (Id. at 6.)  First, Worldwide sent two letters to D4S detailing D4S's negative feedback.  Then Worldwide supposedly interfered with D4S's efforts to resolve a donation dispute with a sponsor so that Worldwide could use the misunderstanding to portray D4S in a bad light.

### D.  Post-Affiliation

After its membership in Worldwide was terminated, D4S resumed operating under the DRESS 4 SUCCESS mark.  On February 28, 2008 – after Worldwide informed D4S that it

was going to recommend to its board that D4S's membership be terminated but before termination became official – D4S registered the Internet domain name www.dress4success.org. The website allegedly copies text verbatim from Worldwide's site, www.dressforsuccess.org.

Worldwide accuses D4S of exploiting confusion over the organizations' marks after its membership was terminated. According to Worldwide, on March 10, 2008, D4S accepted a donation from one of Worldwide's sponsors intended for Worldwide's Los Angeles affiliate. Worldwide further alleges that Lavender told a Worldwide donor that D4S was accepting suit donations as a part of a national suit drive conducted by Worldwide. Finally, Worldwide claims that the website of another organization that Lavender founded, Go Green 4 Success, refers to D4S as a "national organization" even though it is Worldwide, and not D4S, that operates nationally. (Pl.'s Mem. 8.)

On May 20, 2008, Worldwide sent D4S a letter demanding that D4S refrain from any current or future use of the DRESS 4 SUCCESS mark. D4S responded that it would not voluntarily comply. Worldwide now moves to preliminarily enjoin D4S from using the DRESS 4 SUCCESS mark and www.dress4success.org website. D4S cross-moves to

preliminarily enjoin Worldwide from using the DRESS FOR
SUCCESS mark in the Los Angeles area.

## II.  DISCUSSION

### A.  Evidentiary Hearing

As a preliminary matter, the Court explains why it did
not conduct an evidentiary hearing before ruling on the
instant motions.  "[O]n a motion for a preliminary
injunction, where essential facts are in dispute, there
must be [an evidentiary] hearing . . . and appropriate
findings of fact must be made." Fengler v. Numismatic
Americana, Inc., 832 F.2d 745, 747 (2d Cir. 1987) (internal
quotation marks omitted).  However, "[t]here is no hard and
fast rule in this circuit that oral testimony must be taken
on a motion for a preliminary injunction or that the court
can in no circumstances dispose of the motion on the papers
before it." Consol. Gold Fields PLC v. Minorco, S.A., 871
F.2d 252, 256 (2d Cir. 1989).  Notably, a party can waive
the right to an evidentiary hearing. Id. ("[Defendant],
having been content to rest on affidavits submitted to the
District Court, waived its right to an evidentiary
hearing.")

Defendant D4S expressly waived its right to an
evidentiary hearing on two separate occasions.  In a letter

to the Court dated November 13, 2008, counsel for D4S wrote
the following:

> We ask the Court to consider proceeding
> without an evidentiary hearing.    We
> have a significant practical reason for
> the request, in addition to believing
> that an evidentiary hearing is not
> necessary.   We recently learned, and
> promptly informed plaintiff's counsel
> that the founder and executive director
> of [D4S], who would be defendant's sole
> witness, has an injured hip that will
> prevent her from taking a cross-country
> flight.

Later in the same letter, after listing the parties'
disputes, defense counsel concluded, "it does not appear
that an evidentiary hearing is necessary or would provide
facts any more determinative than what is already in the
record."

   Defense counsel reiterated this position at Oral
Argument on November 19, 2008:

> The Court: . . . I just want to confirm
> for the record that[, defense counsel,]
> in your letter of November 13 – which I
> received on November 13 – you point out
> twice in the letter on paragraph –
> excuse me – in paragraph 3, on page 1,
> an evidentiary hearing is not
> necessary.   And then you say again on
> page 2 in the first full paragraph it
> does not appear that there are any
> material facts in dispute that would be
> outcome determinative.    Then later on
> in the same paragraph you say it does
> not appear that an evidentiary hearing
> is necessary.   I just want to make sure
> that's your position, right?

11

[Defense Counsel]: Yes, your honor.

The Court: Ok.  Thank you.  All right.

(Oral Argument Tr. 2:23-3:9.)  Therefore, D4S, which was content to rest on its paper submissions, waived its right to an evidentiary hearing.  This waiver does not impair the Court's ability to decide the instant motions due to the parties' voluminous paper submissions and since the determinative issues are not factual but legal in nature.

**B.  Worldwide's Motion for a Preliminary Injunction**

**1.  Preliminary Injunction Standard**

To secure a preliminary injunction, the moving party must demonstrate "(1) that it will be irreparably harmed in the absence of an injunction, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits of the case to make it a fair ground for litigation, and a balance of hardships tipping decidedly in its favor." Mony Group, Inc. v. Highfields Capital Mgmt., L.P., 368 F.3d 138, 143 (2d Cir. 2004).  Where a preliminary injunction would alter the status quo by commanding a positive act – a so-called "mandatory injunction" – courts use a higher standard. Tom Doherty Assocs. v. Saban Entm't, Inc., 60 F.3d 27, 34 (2d Cir. 1995).  A mandatory injunction – as opposed to a

"prohibitory injunction" – will issue "only upon a clear showing that the moving party is entitled to the relief requested or where extreme or very serious damage will result from a denial of preliminary relief." Abdul Wali v. Coughlin, 754 F.2d 1015, 1025 (2d Cir. 1985) (citation and internal quotation marks omitted).

"[A]s a general rule, the status quo is the last uncontested status which preceded the pending controversy." Nat'l Ass'n of Letter Carriers v. Sombrotto, 449 F.2d 915, 921 (2d Cir. 1971).  The Second Circuit has noted, though, that "[d]etermining whether the status quo is to be maintained or upset has led to distinctions that are more semantic[] than substantive." Tom Doherty Assocs., 60 F.3d at 34 (internal quotation marks omitted); accord Jolly v. Coughlin, 76 F.3d 468, 474 (2d Cir. 1996) ("[I]n a close case an injunction can be framed in mandatory or prohibitory terms.").

The parties dispute whether the status quo would be upset if the Court enjoins D4S from using the DRESS 4 SUCCESS mark.  Worldwide alleges that D4S abandoned the mark during Affiliation while D4S claims it continued to use the mark for certain matters.  The Court need not decide which standard applies, however, since, as discussed below, Worldwide meets even the heightened requirement of

13

making a clear showing that it is likely to succeed on the merits and will be irreparably harmed absent a preliminary injunction.

## 2. Likelihood of Success

Worldwide's underlying claim is for trade name and service mark infringement.[1]  To succeed on this claim, Worldwide must demonstrate, first, that its "mark merits protection, and second, [that] defendant's use of a similar mark is likely to cause consumer confusion." Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d 108, 115 (2d Cir. 2006).

### a. Merits Protection

Worldwide argues that its DRESS FOR SUCCESS mark merits protection on the following grounds: (i) The mark is federally registered and incontestable, and D4S's common law trademark rights do not limit Worldwide's rights because of (ii) the merger rule, (iii) the doctrine of licensee estoppel, and (iv) the doctrine of abandonment.

### i. Federally Registered and Incontestable

---

[1] Worldwide's complaint actually lists six grounds for relief: (1) federal service mark infringement; (2) federal unfair competition, false designation of origin, and false advertising; (3) dilution of a famous mark; (4) common law trade name and service mark infringement and unfair competition; (5) conversion; and (6) breach of contract. However, Worldwide's briefs on the motion for preliminary injunction only discuss the likelihood of success on the service mark infringement claim.

"A mark is presumed to merit protection when the plaintiff has a valid, registered trademark." <u>Pan Am World Airways, Inc. v. Flight 001, Inc.</u>, No. 06 Civ. 14442, 2007 U.S. Dist. LEXIS 51012, at *31 (S.D.N.Y. July 13, 2007). Under the Lanham Act, when a "registered mark has been in continuous use for five consecutive years" it becomes incontestable. 15 U.S.C. § 1065. An incontestable trademark "shall be conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce." <u>Id.</u> § 1115(b). However, the Lanham Act preserves the common law trademark rights of parties whose continuous use of a similar mark predates the registration in question. <u>Id.</u> § 1115(b)(5).

Worldwide's DRESS FOR SUCCESS mark is federally registered and, having been in continuous use for more than five consecutive years, is incontestable. For the purposes of this motion, though, Worldwide concedes that D4S had preexisting common law trademark rights in its DRESS 4 SUCCESS mark. (Pl.'s Mem. 11 n.4.) Worldwide's mark, then, merits protection against D4S only if D4S's common law rights did not survive Affiliation.

### ii. Merger Rule

Worldwide argues that the merger rule extinguished any common law rights that D4S may have had in the DRESS 4 SUCCESS mark.   Under the merger rule, "A licensee's prior claims of any independent rights to a trademark are lost, or merged into the license, when he accepts his position as licensee, thereby acknowledging the licensor owns the marks and that his rights are derived from the licensor and enure to the benefit of the licensor." Bunn-O-Matic Corp. v. Bunn Coffee Serv., Inc., 88 F. Supp. 2d 914, 923 (C.D. Ill. 2000).   Professor J. Thomas McCarthy illustrates the rule with an example:

> (1) Party Alpha uses the mark and later becomes a licensee of Beta under the same mark; and (2) the Alpha-Beta license ends; then (3) Alpha cannot rely upon its prior independent use as a defense against an infringement claim brought against it by Beta.   Alpha's prior trademark rights were "merged" with that of Beta and inured to the benefit of Beta.

3 J. Thomas McCarthy, McCarthy on Trademark and Unfair Competition § 18:47 (4th ed. 2008).

Whether the merger rule is a valid rule is a question of first impression in the Second Circuit.   Notably though, at least one other circuit court and several district courts in various circuits have employed the rule. See, e.g., Grand Lodge Improved v. Eureka Lodge, 114 F.2d 46, 48

(4th Cir. 1940) (finding that defendant could not rely on its prior common law rights to a trade name since defendant "merged" with plaintiff when defendant became plaintiff's local affiliate); Nat'l Board of YWCA v. YWCA of Charleston, 335 F. Supp. 615 (D.S.C. 1971) (same); U.S. Jaycees v. S.F. Junior Chamber of Commerce, 354 F. Supp. 61, 72 (N.D. Cal. 1972) (same); Council of Better Business Bureaus, Inc. v. Better Business Bureau, Inc., No. 78-937, 1978 U.S. Dist. LEXIS 15903 (S.D. Fla. 1978) (same); Hot Stuff Foods, LLC v. Mean Gene's Enters., 468 F. Supp. 2d 1078, 1095 (D.S.D. 2006) (applying the merger rule in the licensor-licensee context); Bunn-O-Matic Corp. v. Bunn Coffee Serv., Inc., 88 F. Supp. 2d 914, 923 (C.D. Ill. 2000) (same).

D4S urges the Court not to apply the merger rule in the instant case for four reasons.  First, D4S asserts that the merger rule is "neither well-settled nor uniformly or frequently applied." (Def.'s Response 11.)  Yet D4S can cite no case in which a court has expressly rejected the rule.

Second, D4S claims that all prior applications of the merger rule can be distinguished from the instant case. D4S argues that Grand Lodge, National Board of YWCA, U.S. Jaycees, and Council of Better Business Bureaus (the "Local

Affiliate Cases") applied a different sort of merger rule because these courts found that the organizations, as opposed to the trademarks, merged.  D4S distinguishes <u>Bunn-O-Matic Corp.</u> and <u>Hot Stuff Foods</u> (the "Licensor-Licensee Cases") on the grounds that the defendants in those cases had no prior rights to the mark and used the mark in bad faith.  In light of the merger rule's novelty in the Second Circuit, the Court considers these cases – and D4S's attempt to distinguish them – at some length.

In <u>Grand Lodge</u>, the national fraternal order of the Elks sought to enjoin a local Elks lodge – and former affiliate of the national order – from using the ELKS mark. The Fourth Circuit found that the local lodge – which had used the ELKS mark even before the national order's incorporation – could not rely on its prior use of the mark in defending against the injunction.  The court reasoned, "Any separate existence which [the local lodge] may have had prior to 1899 was merged with that of plaintiff on acceptance of the charter." <u>Grand Lodge</u>, 114 F.2d at 48.

<u>National Board of YWCA</u> concerned the national YWCA's trademark infringement suit against its former Charleston affiliate.  As in <u>Grand Lodge</u>, the local affiliate had organized itself even before the national group did. Nonetheless, the district court followed the Fourth

Circuit's lead and discounted the Charleston YWCA's prior use of the YWCA mark: "[A]ny separate existence that the Charleston YWCA might have had prior to plaintiff's formation in 1906, was merged with that of the plaintiff when the Charleston YWCA became a charter member of the national association." Nat'l Board of YWCA, 335 F. Supp. at 622.

The U.S. Jaycees court confronted a trademark infringement claim brought by the U.S. Jaycees – or "J.C.s," as in Junior Citizens – against the San Francisco Junior Chamber of Commerce ("SFJCC"). The U.S. Jaycees objected to SFJCC's continued use of the marks J.C., JAYCEES, and the like after SFJCC disaffiliated from the national organization. At the outset, the court observed, "The common law of trademark infringement and unfair competition is replete with cases holding that benevolent, religious, charitable or fraternal organizations are entitled to injunctive relief protecting against the continued use of their name by local chapters which disaffiliate." U.S. Jaycees, 354 F. Supp. at 71. The court then applied the logic of Grand Lodge and National Board of YWCA:

> [N]otwithstanding the fact that defendant SFJCC was organized approximately one year prior to its

>           affiliation   with  [the   state   Jaycee
>           group]  and  three  years  prior  to  its
>           affiliation  with  [the  national  Jaycee
>           group],   any    separate    existence
>           defendant  SFJCC  might  have  had  prior  to
>           its   affiliation   with   plaintiffs   was
>           merged   with   plaintiff   organizations
>           upon   SFJCC's   affiliation   with   and
>           charter     membership     in     these
>           organizations.

Id. at 72.

In  the  final  Local  Affiliate  Case,  Council of Better

Business  Bureaus,  the  plaintiff  national  organization

sought  to  enjoin  a  former  local  affiliate  in  South  Florida

from  continuing  to  use  the  BETTER  BUSINESS  BUREAU  mark.   In

granting  the  injunction,  the  court  held  as  follows:

>           Courts  have  repeatedly  held  that  any
>           separate  existence  and  right  to  use  a
>           national  organization's  name  or  mark
>           which  a  seceding  local  chapter  might
>           have  had  prior  to  affiliation  with  the
>           national,  was  merged  with  that  of  the
>           national  when  the  local  became  a  member
>           of  the  national  organization,  thus
>           rejecting    contentions    that    prior
>           independent  existence  and  prior  use  of
>           the  mark  in  question  entitled  a
>           seceding  member  to  continue  using  the
>           mark  subsequent  to  disaffiliation.

Council of Better Business Bureaus,  1978  U.S.  Dist.  LEXIS

15903,  at  *40.

D4S  distinguishes  the  Local  Affiliate  Cases  on  the

ground  that  the  organizations  themselves,  as  opposed  to  the

trademarks,  merged.   In  all  of  these  cases,  the  courts  do

hold that the local organizations lost their "separate existence" while affiliated with the national organizations.  In the instant case, on the other hand, Worldwide has gone to great lengths to stress that D4S was an independent organization during Affiliation.  (Worldwide makes this argument in order to defeat D4S's claim that Worldwide operated an illegal franchise system; this claim is discussed infra.)  Nonetheless, the Court does not find this distinction to be a strong one.

To the extent that the Local Affiliate Cases discuss the relationship between the local affiliates and the national organizations, the arrangement does not sound all that dissimilar to that in the instant case.  In Council of Better Business Bureaus, for example, the court described the local affiliate as "one of 123 local Better Business Bureaus paying dues to and having membership in the nationally-oriented Council." Id. at *3.  In U.S. Jaycess, the court called the national group, with its 6,000 dues-paying affiliates,

> an integrated collective organization made up of state and local organizations, all of which are engaged in the services of 'organizing and holding meetings, competitions, and other special events for young men interested in the affairs and improvement of their communities, with the purpose of fostering interest in

21

> community betterment programs at the
> local, state and national levels, as
> well as offering leadership experience
> to the members.

U.S. Jaycess, 354 F. Supp. at 68.  If acquiring membership,

paying dues, and performing activities in line with the

national organization's mandate means that a local

affiliate forfeits its separate existence for the purposes

of the merger rule, then D4S, which accepted membership in

Worldwide, paid a membership fee, and provided clothes and

career services to the disadvantaged in accordance with

Worldwide's Guidelines, arguably did the same.  But even if

the Court accepted D4S's argument that the Local Affiliate

Cases are not precisely on point, it would nonetheless

consider them highly persuasive authority.

D4S attempts to distinguish the Licensor-Licensee

Cases, which do not involve local affiliates but rather

trademark licensors and licensees, on the grounds that the

defendants in those cases had no prior rights to the mark

and used the mark in bad faith.  In Bunn-O-Matic Corp.,

plaintiff Bunn-IL, an Illinois-based manufacturer of coffee

makers formed in 1957, brought a trademark infringement

suit against Bunn-NY, a New York-based coffee service

company formed in 1972.  Bunn-NY operated under some

variation of the BUNN mark, which Bunn-IL also used, in all

business dealings except those with Bunn-IL, from which it purchased equipment. In those dealings, Bunn-NY represented itself as Coffee Break Industries, Inc. When Bunn-IL became aware of Bunn-NY's use of the BUNN mark, it demanded Bunn-NY enter into a licensing agreement with Bunn-IL or face legal action. Bunn-NY capitulated and entered an agreement that granted it the right to use the BUNN COFFEE SERVICES mark. In the agreement, Bunn-NY acknowledged that Bunn-IL retained the rights to various other BUNN marks. Nonetheless, Bunn-NY continued to use the BUNN mark – which the agreement expressly reserved for Bunn-IL – and the BUNN-1 mark – which the agreement did not expressly discuss. Bunn-IL accused Bunn-NY of breaching the agreement and brought suit alleging, among other things, trademark infringement.

In granting Bunn-IL summary judgment on its trademark infringement claim, the court rejected Bunn-NY's claims of rights to the marks based on prior use: "A licensee's prior claims of any independent rights to a trademark are lost, or merged into the license, when he accepts his position as licensee, thereby acknowledging the licensor owns the marks and that his rights are derived from the licensor and enure to the benefit of the licensor." Bunn-O-Matic Corp., 88 F. Supp. 2d at 923 (C.D. Ill. 2000). The

court reached this holding independent of any findings of bad faith, unfair competition, or intentional breach of contract on the part of Bunn-NY. The court also apparently considered it unnecessary in the context of merger analysis to determine whether Bunn-NY had any prior rights in the marks in question, since, even if it did, those rights would be extinguished. See id. ("Bunn-NY lost any independent claim of right to the name when it signed the license.")

In Hot Stuff Foods, plaintiff Hot Stuff Foods, a food systems marketer, asked the court to enjoin wrestling announcer Gene Okerlund ("Okerlund"), better known to his fans as "Mean Gene," and his company Mean Gene's Enterprises from using the MEAN GENE mark. Okerlund had entered into a personality endorsement agreement with Hot Stuff Foods, granting it the right to use his name and likeness to promote its products. Okerlund opposed the injunction partially on the ground that any independent common law rights that Hot Stuff Foods had in the MEAN GENE mark merged when Hot Stuff Foods entered the personality endorsement agreement. The court applied the merger rule exactly as enunciated in Bunn-O-Matic Corp. and found that the agreement extinguished any prior rights that Hot Stuff Foods might have had. Again, the court reached this

24

finding independent of any claims of bad faith and without having to determine what if any prior rights Hot Stuff Foods had in the mark.

The Licensor-Licensee cases are on point.  Like the instant case, they deal with a licensee's trademark rights against the licensor.   Their holdings do not hinge on findings of bad faith or whether the licensee had prior common law rights in the mark.   In fact, whether the licensee had prior rights is a moot question since the merger rule extinguishes any that existed.   D4S's attempts to distinguish <u>Bunn-O-Matic Corp.</u> and <u>Hot Stuff Foods</u> from the instant case are therefore unsuccessful.

D4S's third objection to the merger rule is that it is unnecessary and inappropriate where the disaffiliating parties do not use identical marks.   However courts have applied the merger rule in cases, like the instant case, where the disaffiliating parties use slightly different marks.   In <u>Bunn-O-Matic Corp.</u>, for example, the district court found that Bunn-NY's rights to the BUNN mark had merged, preventing Bunn-NY from using any variation of the mark, such as BUNN-1.

Fourth, D4S complains that the merger rule would give Worldwide the benefit of something it did not bargain for in the Agreements, namely, termination of D4S's common law

trademark rights.   Contracting parties often benefit from or are burdened by terms not explicitly bargained for, however, such as implied warranties and covenants of good faith.   Furthermore, as Worldwide points out, D4S explicitly acknowledged through the Agreements that Worldwide possessed the superior right in the DRESS FOR SUCCESS mark.[2]   This should have put D4S on notice that it was jeopardizing its rights in a confusingly similar mark.

The Court follows the lead of the Fourth Circuit, several district courts, and a well-respected trademark treatise in applying the merger rule to the instant case. Whatever common law rights D4S possessed in its DRESS 4 SUCCESS mark were extinguished when D4S signed the Agreements.   Since D4S cannot demonstrate that it still has common law rights in the DRESS 4 SUCCESS mark, it cannot overcome Worldwide's federally registered trademark. Worldwide has therefore made a clear showing that its mark merits protection against D4S.

This finding eliminates the need to consider Worldwide's licensee estoppel and abandonment arguments.

### 3.  Likelihood of Confusion

---

[2]  The relevant portion of the agreement reads, "Licensee acknowledges Licensor's exclusive, right, title, and interest in and to the Trademark and associated goodwill . . . ." (Lavender Decl. Ex. G ¶ 3f.)

To demonstrate a likelihood of success on the merits, Worldwide must also show that D4S's use of the DRESS 4 SUCCESS mark is likely to cause consumer confusion.   In gauging the likelihood of consumer confusion, courts consider the following eight factors:

    a.   the strength of plaintiff's mark;

    b.   the similarity of the parties' marks;

    c.   the proximity of the parties' products in the marketplace;

    d.   the likelihood that the plaintiff will "bridge the gap" between the products;

    e.   actual consumer confusion between the two marks;

    f.   the defendant's intent in adopting its mark;

    g.   the quality of the defendant's product; and

    h.   the sophistication of the relevant consumer group.

Playtex Prods. v. Georgia-Pacific Corp., 390 F.3d 158, 162 (2d Cir. 2004).

D4S concedes that "there is a likelihood of confusion between DRESS 4 SUCCESS and DRESS FOR SUCCESS, based on the similarity between the marks and the parties' services." (Def.'s Response 15.)   The Court agrees.

Worldwide has made a clear showing that the DRESS FOR SUCCESS mark merits protection on the grounds that D4S's

common law trademark rights merged when D4S signed the Agreements. Worldwide has also made a clear showing that there is a likelihood of confusion between the marks. Worldwide is therefore likely to succeed on the merits on its underlying trademark infringement claim.

This finding eliminates the need to balance the hardships.

### 3.   Irreparable Harm

In the context of a dispute between a licensor and licensee of a trademark, a finding of irreparable harm is automatic once the movant demonstrates unlawful use and consumer confusion. Church of Scientology Int'l v. Elmira Mission of Church of Scientology, 794 F.2d 38, 42 (2d Cir. 1986). Both requirements are met here. D4S's use of the DRESS 4 SUCCESS is unlawful since any common law rights it might have had in the mark merged when D4S signed the Agreements. D4S also concedes that consumer confusion will result from the use of its mark. Therefore, the Court finds that Worldwide will be irreparably harmed absent a preliminary injunction.

### 4.   D4S's Defenses

D4S argues that Worldwide cannot overcome the following defenses: (1) the doctrine of unclean hands and (2) the doctrines of laches and acquiescence.

### a.  Unclean Hands

"A court may deny injunctive relief based on the defense of unclean hands where the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith" related to the matter at issue. Cartier v. Symbolix, Inc., 386 F. Supp. 2d 354, 362 (S.D.N.Y. 2005) (internal quotation marks omitted). "Typically, courts that have denied injunctive relief due to plaintiff's unclean hands have found plaintiff guilty of truly unconscionable and brazen behavior." Gidatex, S.r.L. v. Campaniello Imports, Ltd., 82 F. Supp. 2d 126, 131 (S.D.N.Y. 1999); see also Patsy's Italian Rest., Inc. v. Banas, No. 06-CV-0729, 2008 U.S. Dist. LEXIS 77802, at *85 (E.D.N.Y. Sept. 9, 2008) ("[B]ecause trademark law also involves protecting the public's interests, courts typically only bar recovery under a theory of unclean hands when a plaintiff's conduct was egregious, or clear, unequivocal and convincing." (citations and internal quotation marks omitted)).  Examples of such behavior include perjury and fraud on the court. See, e.g., Goldstein v. Delgratia Mining Corp., 176 F.R.D. 454, 458 (S.D.N.Y. 1997) (enforcing unclean hands defense where plaintiff made multiple misrepresentations to the court regarding law and facts); Aris-Isotoner Gloves, Inc. v.

Berkshire Fashions, Inc., 792 F. Supp. 969, 970 (S.D.N.Y.) (enforcing unclean hands defense where defendant company's president fabricated testimony).  The burden of proof falls on the party asserting the defense. Gidatex, 82 F. Supp. 2d at 130.

D4S alleges that Worldwide has unclean hands because (i) Worldwide misrepresented its intentions to induce D4S to enter the Agreements, (ii) Worldwide failed to perform its obligation under the Agreements, (iii) Worldwide attempted to operate an illegal franchise, and (iv) Worldwide set out to create a record to justify terminating D4S's membership.

### i.  Misrepresented Intentions

D4S claims that Worldwide induced D4S to sign the Agreements with promises of a joint fundraiser and a donation-sharing arrangement.[3]  Neither materialized.  Even if the Court accepts this claim as true, however, it does

---

[3] Worldwide argues that the parol evidence rule, in conjunction with the Agreements' integration clauses, bars any evidence proffered by D4S regarding the joint fundraiser and donation-sharing arrangement.  "[T]he parol evidence rule forbids proof of an oral agreement that might add to or vary the terms of a written contract that was intended to embody the entire agreement between the parties." Albany Sav. Bank, F.S.B. v. Halpin, 117 F.3d 669, 672 (2d Cir. 1997).  D4S is not introducing this evidence in an attempt to alter the terms of the contract, but rather to prove Worldwide's inequitable conduct generally.  Therefore, the parol evidence rule does not preclude consideration of this evidence.

not rise to the level of being "truly unconscionable." Id.
at 131. Such behavior is in no way akin to perjury or
fraud on the court and does not justify application of the
doctrine of unclean hands.

### ii.  Failed Performance

D4S complains that Worldwide failed to perform its
obligations under the Agreements by refusing to provide D4S
with financial support; denying D4S access to donors and
sponsors; imposing additional requirements on D4S through
the Guidelines; punishing D4S by placing it on probation;
and announcing its intention to open another affiliate in
Hollywood, California, after D4S refused to marginalize
Lavender.

Again, even if the Court accepts these claims as true,
they are not "truly unconscionable" and therefore do not
justify applying the unclean hands doctrine. See id. at 131
(finding that "poor performance of a contract does not rise
to the level of unconscionability required to support an
unclean hands defense").

### iii.  Illegal Franchise

D4S argues that the extent of Worldwide's control over
D4S meant that Worldwide operated an unauthorized and
illegal franchise system, apparently justifying application

of the unclean hands doctrine.  California law defines a franchise as follows:

> [A] contract or agreement, either expressed or implied, whether oral or written, between two or more persons by which:
> (1) A franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor; and
> (2) The operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising or other commercial symbol designating the franchisor or its affiliate; and
> (3) The franchisee is required to pay, directly or indirectly, a franchise fee.

Cal. Corp. Code § 31005 (Deering 2008).  Few California courts have defined "marketing plan or system," but those that have found extensive control and material assistance essential.  See, e.g., People v. Kline, 168 Cal. Rptr. 185, 185 (Ct. App. 1980) (finding a "marketing plan or system" existed where restaurant franchisor offered a complete operational plan, advertising and promotional support, menu, food, supplies, and distinctive kiosks and labeled the offer "a business opportunity").

Worldwide did not operate an illegal franchise. Though the Guidelines controlled (or offered advice on) many aspects of D4S's operations, they did not provide the same level of control (or assistance) as the prototypical marketing plan, as seen in Kline.

### iv.  Creating a Record in Bad Faith

D4S alleges that Worldwide set out to create a record justifying the termination of D4S's membership in three ways:  First, D4S argues that Worldwide placed onerous probation terms on D4S in order to ensure D4S's poor performance.  Second, D4S claims that Worldwide sent two letters to D4S detailing negative feedback.  Third, D4S asserts that Worldwide prevented D4S from settling a dispute with a Worldwide donor who mistakenly gave a $10,000 donation to D4S.

Again, even assuming that D4S's claims are true, the Court finds that they fall short of being "truly unconscionable."

### b.  Acquiescence and Laches

A party asserting the affirmative defense of acquiescence must prove three elements: "(1) the senior user actively represented that it would not assert a right or a claim; (2) the delay between the active representation and assertion of the right or claim was not excusable; and

(3) the delay caused the defendant undue prejudice." Times Mirror Magazines, Inc. v. Field & Stream Licenses Co., 294 F.3d 383, 395 (2d Cir. 2002).

A defendant asserting the related affirmative defense of laches must show that the plaintiff unreasonably delayed asserting a right to the point of prejudicing the defendant. Times Mirror Magazines, 294 F.3d at 395.

D4S cannot maintain a defense of laches or acquiescence.  D4S has not shown how it is prejudiced by the delay beyond simply asserting that it relied on Worldwide's express and/or implied assurances.  D4S does not claim, for example, that certain witnesses and evidence are now unavailable, as in the typical laches case. See, e.g., Serdarevic v. Advanced Med. Optics, Inc., No. 06 Civ. 7107, 2007 U.S. Dist. LEXIS 70419, at *12 (S.D.N.Y. Sept. 25, 2007).

## C.  D4S's Cross-Motion for a Preliminary Injunction

### 1.  Preliminary Injunction Standard

D4S's cross-motion would alter the status quo by preventing Worldwide from using the DRESS FOR SUCCESS mark in Los Angeles as it has though its affiliate D4S since at least 2001.  Therefore, D4S must make a "clear showing" that (1) it will be irreparably harmed in the absence of an injunction and (2) either (a) a likelihood of success on

34

the merits or (b) sufficiently serious questions going to the merits of the case and a balance of hardships tipping decidedly in its favor. Abdul Wali v. Coughlin, 754 F.2d 1015, 1025 (2d Cir. 1985).

## 2. Likelihood of Success

D4S moves for a preliminary injunction on its trademark infringement and unfair competition counterclaims.

### a. Trademark Infringement

For the purposes of these motions, Worldwide concedes that D4S had common law rights in the DRESS 4 SUCCESS mark prior to Affiliation. (Pl.'s Mem. 11 n.4.)   Nonetheless, as discussed above, D4S is unlikely to succeed in proving that its common law trademark rights survived Affiliation.

Therefore, D4S is unlikely to succeed on the merits on its trademark infringement claim.

### b. Unfair Competition

California law defines unfair competition as "any unlawful, unfair or fraudulent business act or practice." Cel-Tech Commc'ns v. L.A. Cellular Tel. Co., 20 Cal. 4th 163, 180 (1999) (citing Cal. Bus. & Prof. Code § 17200). "[A]n 'unfair' business practice occurs when it offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially

injurious to consumers." <u>Spiefler v. Home Depot U.S.A., Inc.</u>, 552 F. Supp. 2d 1035, 1045 (C.D. Cal. 2008).

D4S alleges that Worldwide engaged in unfair business practices when Worldwide (1) infringed on D4S's common law trademark rights, (2) engaged in inequitable conduct, and (3) illegally operated a franchise.

None of these arguments is likely to succeed for reasons already discussed. First, D4S's common law rights in the DRESS 4 SUCCESS mark merged when D4S signed the Agreements. Second, even assuming Worldwide did engage in inequitable conduct, it likely falls short of being immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. Third, Worldwide did not operate an illegal franchise. Therefore, D4S's unfair competition claim is unlikely to succeed.

### 3. Balance of Hardships

The Court finds, for the reasons discussed above, that there are not sufficiently serious questions going to the merits of D4S's trademark infringement or unfair competition claims to justify balancing the hardships.

D4S is thus not entitled to a preliminary injunction.

### III. CONCLUSION

The Court grants Worldwide's motion and denies D4S's motion. The Court hereby enters a preliminary injunction

enjoining Defendant D4S from using the DRESS 4 SUCCESS mark

in any form or variation in connection with its operations,

including as a website address.[4]

SO ORDERED.

Dated:    New York, New York

          December 5 , 2008

                                    _John F. Keenan_

                              JOHN F. KEENAN

                        United States District Judge

---

[4] The Court recognizes that this injunction will cause D4S
substantial hardship.  The Court appreciates Worldwide's
attempt to mitigate this hardship in a letter dated
November 21, 2008, by suggesting alternative marks for D4S,
such as "Fashioning Your Future," "Attired to Aspire," and
"Suitable Opportunities."  To that list, the Court adds its
own:  "Career InVestments."  It does so in the hopes that
D4S will continue its commendable work for the people of
Los Angeles, albeit under a different name.